UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH CELLULAR DEVICES | Case No.   3:23-mj-456 RMS<br><br>**Filed Under Seal** |

## AFFIDAVIT

I, Corbett Tomsovic, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the Unites States Code; that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for federal felony offenses. I am a Special Agent with the Federal Bureau of Investigation (FBI). I have been employed by the FBI since June 2021. I have been assigned to the FBI's New Haven, Connecticut Field Office, and, more specifically, to the Waterbury Safe Streets Gang Task Force (Task Force). While employed as a Task Force Officer with the FBI, I have conducted investigations of, and have been instructed in, investigative techniques concerning the unlawful possession, sale and distribution of firearms, distribution of illegal narcotics, possession with intent to distribute controlled substances, importation of illegal narcotics, use of communication facilities to conduct illegal narcotics transactions, maintaining places for purposes of manufacturing, distributing or using controlled substances and conspiracies to commit these offenses.

2.      Based upon this experience, and through the experience of other agents and Task Force Officers with numerous years of experience, I have also become well versed in the methods used in illegal narcotics and firearms trafficking, the specific type of language used by illegal narcotics and firearms traffickers, and the unique patterns employed by these

organizations.  I have also conducted physical, electronic, and wire surveillance. Additionally, I have arrested individuals for various drug and firearms violations and have spoken with a number of law enforcement officers, subjects, and confidential sources concerning the methods and practices of drug and firearm traffickers. As a result of my law enforcement experiences and the experience of other agents and detectives, I have worked with to investigate drug and firearms traffickers, I have found that they rarely speak openly about their illegal narcotics or firearm transactions. Instead, they use coded language to disguise their conversations about their activities and communicate via text messages. I am also aware that cellular telephones provide illegal narcotics and firearms traffickers with mobile access and control over their illegal trade. They often use cellular telephones to communicate with one another in furtherance of their illegal activities via both voice and text message communications. I also know that illegal narcotics and firearms traffickers routinely use false information when registering their cellular telephones and use cellular telephone numbers and cellular telephones for short periods of time. I have also conducted investigations involving the identification of co-conspirators using telephone records and bills, financial records, drug ledgers, photographs, and other documents.

<u>**REQUEST**</u>

3.      As part of my duties, I am currently participating in an investigation into firearms trafficking by Ramon PICHARDO, Brian BAKER, Fernando SOTO Jr., Algelly DIAZ, Luis PEREZ, and others. Based on the facts set forth in this affidavit, there is probable cause to believe, and I do believe, that violations of Title 18 U.S.C. § 922(a)(6) (False Statement in Purchase of a Firearm); Title 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm); Title 18 U.S.C. § 922(d)(1) (Sale of Firearm to a Convicted Felon); Title 18 U.S.C. § 932 (Straw Purchasing of Firearms); Title 18 U.S.C. § 933 (Trafficking in Firearms); and Title 18 U.S.C.

2

§ 1715 (Firearms as Nonmailable; Regulations) (hereafter referred to as the "Target Offenses")

have been committed, are being committed, and will be committed by Ramon PICHARDO,

Brian BAKER, Fernando SOTO Jr., Algelly DIAZ, Luis PEREZ and others.

4.     I make this affidavit in support of applications for search warrants for information

associated with the following certain devices assigned call numbers:

    a.  860-996-4514 (hereafter referred to as "TARGET TELEPHONE 4"),
which is subscribed to "Fernando Soto," believed to be used by DIAZ and
located in the District of Connecticut, the records and information for
which are in the custody or control of Verizon;

    b.  860-672-8243 (hereafter referred to as "TARGET TELEPHONE 5"),
which is subscribed to "Geraldo Jameson," believed to be used by PEREZ
and located in the District of Connecticut, the records and information for
which are in the custody or control of AT&T.

5.     Additional TARGET TELEPHONES discussed herein, but which are located

outside the District of Connecticut, are identified as follows:

    a.  620-556-8477 (hereafter referred to as "TARGET TELEPHONE 1"),
which is subscribed to "Ramon Pichardo," believed to be used by
PICHARDO and located in the District of Kansas, the records and
information for which are in the custody or control of AT&T;

    b.  760-887-0927 (hereafter referred to as "TARGET TELEPHONE 2"),
which is subscribed to "Brian Baker" believed to be used by BAKER and
located in the District of Kansas, the records and information for which
are in the custody or control of AT&T; and

    c.  860-680-9565 (hereafter referred to as "TARGET TELEPHONE 3"),
which is subscribed to "Fernando Soto," believed to be used by SOTO and
located in the Central District of California, the records and information
for which are in the custody or control of Verizon.

6.     AT&T (headquartered in North Palm Beach, Florida) and Verizon (headquartered

in Bedminster, New Jersey) (collectively, "Service Providers") are providers of wireless

communications services. The Service Providers are providers of electronic communications service, as defined in 18 U.S.C. § 2510(15).

7.      The information to be searched is described in the following paragraphs and in Attachment A to the search warrants. This affidavit is also submitted in support of, and serves as, an application for a warrant pursuant to Federal Rule of Criminal Procedure 41 and Sections 18 U.S.C. 2703(c)(1)(A) and 2711(3), authorizing agents to ascertain the physical location of the TARGET TELEPHONE 4, and TARGET TELEPHONE 5 (collectively, "TARGET TELEPHONES"), including but not limited to E-911 Phase II data or other precise location information concerning the TARGET TELEPHONES, further described in Section I of Attachment B (the "Requested Location Information"), for a period of thirty (30) days of the search warrant. Upon receipt of the information described in Section I of and Attachment B of the search warrants to allow government-authorized persons will review the information to locate items described in Section II of Attachment B.

8.      Because I am seeking the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application by the United States of America for an order pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices (pen-trap devices) to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the TARGET TELEPHONES.

9.     With regard to the aforementioned Pen Register information,[1] this affidavit sets forth a) sufficient information to establish that there are reasonable grounds to believe that the information likely to be obtained by the installation and use of a pen register device or process and a trap-and-trace device or process on the TARGET TELEPHONES is relevant to an ongoing investigation; and, b) sufficiently specific and articulable facts to establish that there are reasonable grounds to believe that the electronic communications records and/or information sought is relevant and material to an ongoing criminal investigation.

10.     With respect to the Requested Location Information,[2] for the reasons set forth herein, there is probable cause to believe that the offenses listed below have been committed, are being committed, and will continue to be committed by the users of the TARGET TELEPHONES, as described more fully below. Moreover, there is probable cause to believe that the Requested Location Information will constitute or lead to evidence of these offenses, including but not limited to the location and seizure of TARGET TELEPHONES and the location of places and persons associated with the illegal activities of the users of the TARGET TELEPHONES.

11.     I am familiar with the facts and circumstances of the investigation as a result of my personal participation in the investigation; from discussions with agents of the FBI, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), Homeland Security Investigations

---

[1] On April 28, 2023, the Honorable U.S. Magistrate Judge Maria E. Garcia for the District of Connecticut authorized Pen Register information associated with TARGET TELEPHONE 3, TARGET TELEPHONE 4, and TARGET TELEPHONE 5. Docket No. 3:23mj400(MEG).

[2] This is the first request for this information pertaining to the TARGET TELEPHONES. On April 28, 2023, the Honorable U.S. Magistrate Judge Maria E. Garcia for the District of Connecticut authorized Pen Register information associated with TARGET TELEPHONE 3, TARGET TELEPHONE 4, and TARGET TELEPHONE 5.

(HIS), and other law enforcement personnel; from information provided by witnesses involved in the investigation; and from my review of records, reports and affidavits relating to the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated. The information contained in this affidavit is based on this familiarity, and upon information which I have reviewed and determined to be accurate and reliable. Since this affidavit is being submitted for the limited purpose of the aforementioned authorizations, I have not included each and every act known to me concerning this investigation. I have set forth only the facts that I believe are essential to establish the foundation necessary to support the issuance of the requested court orders.

## **PROBABLE CAUSE**

### A.  Overview

12.     The FBI and other law enforcement agencies are investigating a gun trafficking organization (hereafter, "GTO") involving PICHARDO, BAKER, SOTO, DIAZ, and PEREZ, and co-conspirators in and around Connecticut, Kansas, and California. As set forth above, PICHARDO, BAKER, SOTO, DIAZ, and PEREZ are each believed to be utilizing one of the Target Telephones in furtherance of the Target Offenses.[3]

---

[3] Unless otherwise noted, all of the times referred to herein are Eastern Standard Time.

13.     As described below, members of the FBI Waterbury Task Force conducted a controlled purchase of firearms from PEREZ in Connecticut utilizing an FBI Confidential Human Source (CHS-1)[4] in May 2023.

14.     Based on the investigation to date, law enforcement believes that PICHARDO, a resident of Elkhart, Kansas, is a "straw purchaser" of firearms. A straw purchaser is a person with a clean background who purchases firearms specifically on behalf of another person to conceal the true ownership of the firearm. The true owner of the firearm is often prohibited from legally purchasing a firearm including convicted felons, domestic violence offenders, juveniles, and individuals with mental illness. Other GTO members, BAKER, SOTO, DIAZ, and PEREZ are convicted felons, and thus, cannot lawfully purchase or possess firearms.

15.     As detailed herein, BAKER, a resident of Scott City, Kansas, is believed to order firearms from individuals, including PICHARDO, for resell outside Kansas, including to Connecticut. Based on information gathered thus far, PICHARDO purchases the majority of the firearms from Top Guns, 2288 Road 230, Deerfield, Kansas, 67838. BAKER then ships the firearms through the United States Postal Service (USPS) on behalf of the GTO. BAKER has the

_____

[4] CHS-1 is a confidential informant, who has not been monetarily compensated for his/her cooperation, except for personal expenses incurred through working with the FBI. CHS-1 has multiple prior felony convictions for Burglary in the Third Degree , Assault Personnel, Violation of Protective Order, and Possession with Intent to Distribute Narcotics, CHS-1 has multiple prior misdemeanor convictions for Interfering/Resisting, Reckless Endangerment in the Second Degree, Assault in the Third Degree, Probation Violation, Burglary in the Third Degree, Assault in the Third Degree, Possession of a Controlled Substance, Larceny in the Sixth Degree, and others. The information provided by CHS-1 has been accurate and has been corroborated in part by independent information obtained by investigators in the current investigation. To my knowledge, CHS-1 has not knowingly provided any false information. The information provided by CHS-1 has been proven to the reliable and trustworthy. As a result, law enforcement has deemed the information that CHS-1 had provided associated with the to be reliable.

following felony convictions: Burglary in the Second Degree, Vehicle Theft, two (2) counts of Assault with a Deadly Weapon, and Evading Police.

16.     SOTO, a resident of Diamond Bar, California, is believed to also broker the firearm transactions, including coordinating the shipment of some of the firearm orders as well as mailing some of the firearms through the USPS on behalf of the GTO via his business MF Express, also based in Diamond Bar, California. SOTO has the following felony convictions: Sale HLCGN/Narcotics, No Pistol Permit, Larceny and the Second Degree, Possession of Weapon or Dangerous Instrument, and Burglary in the Third Degree.

17.     DIAZ, a resident of Hartford, Connecticut, is believed to coordinate the receipt of firearms in Connecticut through the USPS and the storage of such firearms at a stash location in Hartford, Connecticut, on behalf of the GTO. DIAZ has the following felony convictions: Possession of Narcotics, Sale of a Controlled Substance, and Criminal Weapon Possession.

18.     PEREZ, a resident of Waterbury, Connecticut, is believed to obtain the firearms from DIAZ at the Hartford-based stash location before selling the firearms to individuals throughout Connecticut on behalf of the GTO. PEREZ has the following felony convictions: Assault in the Second Degree, Criminal Mischief in the First Degree, Assault in the First Degree, Burglary in the First Degree, Possession with Intent to Distribute, and Unlawful Possession of a Firearm by a Convicted Felon. PEREZ is currently on federal supervised release for his Unlawful Possession of a Firearm by a Convicted Felon conviction.

**B.  Pre-Purchase Meeting: PEREZ and CHS-1**

19.     During the week beginning on April 23, 2023, CHS-1 met with PEREZ for the purpose of ordering firearms at the direction of investigators. CHS-1 met with PEREZ at an agreed upon location in Waterbury, Connecticut. Investigators conducted physical and pole

camera surveillance of the meet location. Investigators observed PEREZ's vehicle[5], a 2013 gray Infiniti Coupe bearing Connecticut registration BH38075, (hereafter, "PEREZ'S VEHICLE") parked at the meet location during the meeting between CHS-1 and PEREZ.

20.     During the meeting, PEREZ stated, "I've been a Latin King 31 years Papi" and "I was out there when Patterson and Passaic was beefing with each other. I'm the one that went out there to stop the beef." PEREZ stated, "If you want Glocks, Glocks went up." CHS-1 stated, "See I got three people lined up right now but they don't want no, no, no, they like that clean shit cause it don't have history to it." PEREZ responded, "No, everything I get, alright check this out my plug is a contractor for Winchester, Colt, and Remington so they give it to him to test fire the guns, try them out whatever, whatever and he basically writes what he feels about it. You know what I'm saying? He tests them. I get them with the serial numbers still on them before they registered in the system." CHS-1 responded, "Official, official so that's what they like." PEREZ responded, "But they not a ghost gun so you're not looking at, you're not looking at fed time and shit but if you get caught it's still state time but it's just (unintelligible)." Later, PEREZ stated, "That right there, Scorpion, I got the desert storm brown one. I paid three bands for that but the drums for it are on back order, alright. I paid an extra 200 for two drums." CHS-1 responded, "See, I got a order for three people right now. How much, would you do a bundle packages if I do more than one, more than one?" PEREZ responded, "Now the thing is, remember I'm only charging a hundred dollars what I'm paying or a hundred dollars more than what I'm paying for the gun so if I'm giving you a Glock for thirteen, I paid twelve for it."

---

[5] On April 20, 2023, the Honorable U.S. Magistrate Judge Maria E. Garcia of the District of Connecticut authorized a tracking warrant for a 2013 gray Infiniti Coupe bearing Connecticut registration BH38075, known to be operated by PEREZ. Docket No. 3:23mj368(MEG). The tracking device was installed by investigators on April 21, 2023.

21.     Later in the conversation PEREZ stated, "Now you said you already have one Scorpion on deck, right?" PEREZ responded, "No, that's my personal, yeah, like my two 1911's that I got in the glove, those are my personals." CHS-1 later advised investigators that at this point during the meeting, PEREZ showed him/her two firearms that were in the glovebox of PEREZ's vehicle.

22.     Later in the conversation CHS-1 asked, "But um so what's on deck right now so I can offer it to them yo cause I got three people lined up. He wanted a revolver but I'm gonna go tell him listen you gotta take what you gotta take." PEREZ responded, "We got um mini forty and we got a P80 Glock 17. I got, I got that same Glock 17 but I bought a 50 round drum and a 32 round clip for it and I got the switch for mine." I believe, based on my training and experience, that when PEREZ stated, "I got the switch for mine" it was a reference to a handgun conversion piece used to transition a firearm from semi-automatic to fully automatic.

23.     Later in the conversation CHS-1 stated, "One of them wanted a revolver cause he don't want no shells spitting out, I respect that you feel me?" PEREZ responded, "So, so do what I do, when you load your shells put a, put a sock on each hand." CHS-1 responded, "That shit work?" PEREZ responded, "Hell yeah, you can't leave prints you aint, if your finger not touching it." Later, PEREZ stated, "You know what? I think somebody, somebody I know got a 38 Security Guard, you know what I'm saying?" CHS-1 stated, "Mmhmm, But is, but is it fresh out the box? That's the only way they taking it." PEREZ responded, "No, that, that one ain't fresh out the box." CHS-1 responded, "You see cause what happened is when I showed them the box and I open it I've been taxing dudes like two bands." PEREZ responded, "Shit, get it. It's like the Taurus's I got, they didn't come in the case but they came in the box." CHS-1 responded, "Yeah, as long, as long." PEREZ stated, "They didn't come in the case, they brand

10

new." CHS-1 stated, "And then you had the little, the little thing to clean it then you had the bro when I presented that, when I presented that the niggas were like yo how much you want for that yo? I was like, this is, this is brand new. The last one for 13, I unloaded that, I made a band off that." PEREZ responded, "Hell yeah." CHS-1 responded, "I mean, but the thing is if I'm driving all the way down there nigga. You feel me if I'm, nigga I'm driving all the way down there I'm taking the risk nigga, I'm doing, I'm doing everything so yeah you gotta pay that fee my nigga cause guess what you can't get it out here. You niggas wanna be naked out there?" PEREZ responded, "That's my shit like, the only reason I charge only a buck cause I'm going to Hartford to go get it but I'm still go to Hartford then I still gotta bring it back to Waterbury and if anything happens, I get pulled over, whatever that's my ass." CHS-1 responded, "You already know. So you said that you have two on deck right now, right?" PEREZ responded, "Yeah, I got these two but I'm, I'm supposed to call him in about a half hour cause California time is three hours behind so I'm gonna call him in a half hour, he gets out of work and then we gonna go over shit. As soon as we go over shit, I'll let you know, I'll send you pictures yo this is what on deck." Investigators reviewed the toll data and found that TARGET TELEPHONE 3 (used by SOTO) contacted TARGET TELELEPHONE 5 (used by PEREZ) the next day with a call duration of approximately five minutes.

24.     Later in the conversation PEREZ stated, "And I got the black talons in that shit. I don't give a fuck what you in my nigga. My shit going through that shit like butter." CHS-1 responded, "Hell yeah it is." PEREZ stated, "I got my AR, I got two AR-15s, one that came with five 30 round clips and all the attachments, the other one that came with two hundred round drums."

25.     Later in the conversation PEREZ stated, "I'm a coke boy to so." CHS-1
responded, "Yeah, how much you want them ounces for?" PEREZ responded, "Right now, I do
the ounces for 11 uncut, untouched right off the key." CHS-1 responded, "Damn that's kinda
pricey my boy. That is pricey though" PEREZ responded, "You could get it cheaper but you're
gonna get it already stepped on." CHS-1 later advised investigators that at this point in the
meeting, PEREZ showed him/her approximately 250 grams of cocaine, 250 grams of crack
cocaine, and one pound of marijuana.

26.     The day following the meeting between PEREZ and CHS-1, CHS-1 received
images (set forth below) from TARGET TELEPHONE 5 (used by PEREZ). As detailed above,
PEREZ stated, "Yeah, I got these two but I'm, I'm supposed to call him in about a half hour
cause California time is three hours behind so I'm gonna call him in a half hour, he gets out of
work and then we gonna go over shit. As soon as we go over shit, I'll let you know, I'll send you
pictures yo this is what on deck." I believe that PEREZ spoke with SOTO about purchasing
firearms to sell in Connecticut. Further, I believe that SOTO or an associate sent PEREZ the
below photographs of firearms available for purchase which PEREZ then, using TARGET
TELEPHONE 5, sent to CHS-1. Investigators instructed CHS-1 to order the CZ Scorpion and
three handguns. Subsequently, CHS-1 contacted PEREZ, using TARGET TELEPHONE 5, and
placed the order for the four firearms. Investigators reviewed the toll records and confirmed the
contact occurred between CS-1 and TARGET TELEPHONE 5 (used by PEREZ).



### C. Controlled Firearms Purchase: PEREZ and CHS-1

27.     PEREZ, using TARGET TELEPHONE 5, contacted CHS-1 and advised that he would be ready to conduct the firearms transaction during the week ending on May 6, 2023.  As a result, investigators met with CHS-1 to conduct a controlled firearms purchase from PEREZ utilizing telephone number 860-672-8243, TARGET TELEPHONE 5.

28.     Investigators received information from the U.S. Postal Inspection Service (USPIS) that on May 1, 2023, two packages were mailed from Scott City, Kansas, to a particular address on Whitmore Street, 2nd Floor, Hartford, Connecticut (hereafter, "STASH LOCATION"), an address associated with DIAZ. One package weighed approximately 7 lbs. 14 oz. and the second package weighed approximately 9 lbs. 12 oz.

29.     Prior to the controlled purchase, investigators initiated physical and pole camera surveillance at the STASH LOCATION as well as at a particular address on Franklin Avenue, Apartment 1N, Hartford, Connecticut (hereafter, "DIAZ RESIDENCE").

30.     A review of telephone toll records for TARGET TELEPHONE-4 (used by DIAZ) reveal that at 08:54:09 on the day of the controlled purchase, TARGET TELEPHONE 4 (used by DIAZ) received an incoming call from TARGET TELEPHONE 3 (used by SOTO). The call between TARGET TELEPHONE 4 and TARGET TELEPHONE 3 lasted approximately 28 seconds. At 09:12:14, TARGET TELEPHONE 4 received another call from TARGET TELEPHONE 5, known used by PEREZ. The call between TARGET TELEPHONE 4 and TARGET TELEPHONE 5 lasted approximately 19 seconds. Given the timing of the communication and evidence, such as the indications from PEREZ to the CHS-1 that he obtained the firearms from another party, I believe that SOTO, DIAZ, and PEREZ were coordinating the shipment of firearms by USPS on that day to the STASH LOCATION via their respective cellular telephone.

31.     At approximately 09:20 a.m. on the day of the controlled purchase, surveillance units observed DIAZ exiting the front door of the DIAZ RESIDENCE. DIAZ walked to the corner of Whitmore Street and looked down the road towards the STASH LOCATION. Investigators noted that the DIAZ RESIDENCE and STASH LOCATION are in close proximity to each other. DIAZ walked to a store across the street then returned to the DIAZ RESIDENCE. DIAZ was observed using a key to open the door marked with the numerical address of the DIAZ RESIDENCE and then entering the building.

32.     At approximately 9:29 a.m. on the day of the controlled purchase, investigators observed DIAZ exit the front entrance of the DIAZ RESIDENCE and proceed west on Bond Street. A silver Honda Accord was observed exiting the rear parking area of the DIAZ RESIDENCE. The same Honda was observed parking across the street from STASH LOCATION. DIAZ exited the Honda Accord, walked towards the STASH LOCATION, then

walked behind the STASH LOCATION. Thus, despite the close distance between the DIAZ

RESIDENCE and the STASH LOCATION, DIAZ elected to drive his vehicle.

33.     At approximately 9:34 a.m. on the day of the controlled purchase, investigators

observed DIAZ on the front porch of the STASH LOCATION. DIAZ checked the mailbox,

retrieved mail from the box, and then walked back towards the rear of the building. A short time

later, a USPS mail truck parked in front of STASH LOCATION. DIAZ walked from the porch

of the STASH LOCATION to the mail truck. DIAZ received two packages (one white box and

one larger brown box) from the mail truck and entered the front door of the STASH LOCATION

with the packages. Soon after, DIAZ exited the rear of the STASH LOCATION empty handed.

34.     Surveillance units noticed that DIAZ appeared to be on the phone at this time. A

review of the telephone toll records revealed that TARGET TELEPHONE 4 (used by DIAZ)

placed a call to TARGET TELEPHONE 5 (used by PEREZ) at a time consistent with law

enforcement's observation of DIAZ utilizing a phone shortly after receiving two packages that

would like be confirmed to be consistent with the two packages provided by PEREZ to CHS-1

during the controlled purchase. Immediately thereafter, TARGET TELEPHONE 4 (used by

DIAZ), placed a call to TARGET TELEPHONE 3 (used by SOTO). Law enforcement observed

DIAZ walk back to his vehicle and drive to the DIAZ RESIDENCE. DIAZ utilized a key to open

the door and entered his residence.

35.     A review of telephone toll records revealed that at 10:47:02 on the day of the

controlled purchase, TARGET TELEPHONE 4 (used by DIAZ) received a 4 second call from

TARGET TELEPHONE 3 (used by SOTO). At 10:55:42 on the day of the controlled purchase,

TARGET TELEPHONE 4 (used by DIAZ) received a call from TARGET TELEPHONE 5 (used

by PEREZ) that lasted 2 seconds. At 10:56:19 on the day of the controlled purchase, TARGET

TELEPHONE 4 (used by DIAZ) received a call from TARGET TELEPHONE 5 (used by PEREZ) that lasted 4 seconds.

36. Thereafter, surveillance observed PEREZ'S VEHICLE traveling south along Franklin Avenue at approximately 10:58 a.m. on the day of the controlled purchase. PEREZ'S VEHICLE pulled into the rear parking lot behind the DIAZ RESIDENCE. A review of telephone toll records at this time revealed that TARGET TELEPHONE 4 (used by DIAZ) missed a call from TARGET TELEPHONE 5 (used by PEREZ). DIAZ was observed by surveillance units exiting the front of the DIAZ RESIDENCE then walking to the rear parking area and speaking with the driver of PEREZ'S VEHICLE, whom investigators were able to later identify as PEREZ. DIAZ then entered the driver seat of a gray 2007 Infiniti passenger car bearing Connecticut license plate AM54943. DIAZ and PEREZ then each drove in their respective car from the parking lot of the DIAZ RESIDENCE, and arrived moments later in front of the STASH LOCATION. PEREZ parked PEREZ'S VEHICLE in the rear of the driveway of the STASH LOCATION.

37. Soon after, PEREZ and DIAZ were observed by surveillance units exiting the rear of the STASH LOCATION. PEREZ was in possession of two postal boxes that matched the description of the ones DIAZ brought into the STASH LOCATION earlier in the day. PEREZ placed the boxes in the trunk of PEREZ'S VEHICLE. One of the boxes in PEREZ's possession looked to have been opened. PEREZ was observed handing DIAZ what appeared to be cash. DIAZ then went inside the rear of the STASH LOCATION. Soon after, DIAZ exited the STASH LOCATION then reentered the gray Infinity he drove to the STASH LOCATION from the DIAZ RESIDENCE. Both DIAZ and PEREZ then left the area of the STASH LOCATION.

Surveillance units observed DIAZ return to the front of the DIAZ RESIDENCE then enter through the front door.

38.     PEREZ'S VEHICLE location was monitored using the installed tracking device as he traveled from Harford, Connecticut, to Naugatuck, Connecticut. While PEREZ was traveling, he did not appear to stop for any significant amount of time between the locations. At approximately 11:17 a.m., TARGET TELEPHONE 5 (used by PEREZ) called CHS-1 and instructed him/her that he was on the way to meet CHS-1.

39.     CHS-1 met with investigators at a secure location. His/her person and vehicle were searched for excess money and contraband with negative results. CHS-1 was equipped with an audio and video recorder and transmitter. CHS-1 was provided a specific amount of government funds to conduct the controlled purchase of the firearms. CHS-1 then departed the secure location. His/her route was monitored by investigators and by the audio and video transmitter.

40.     PEREZ arrived at the arranged meet location in Naugatuck, Connecticut at approximately 12:01 p.m. CHS-1 arrived a short time after. Upon arriving, PEREZ instructed CHS-1 to get inside PEREZ'S VEHICLE. CHS-1 entered PEREZ'S VEHICLE and then gave PEREZ an amount of government funds, which PEREZ counted. CHS-1 exited PEREZ'S VEHICLE, went to the trunk of the vehicle, and removed the white and brown packages that were consistent with the two packages DIAZ had retrieved from the USPS carrier and brought into the STASH LOCATION and the two packages PEREZ/DIAZ subsequently removed from the STASH LOCATION. CHS-1 then went to the driver's window of PEREZ'S VEHICLE where PEREZ showed CHS-1 more photos of firearms on his phone. Thereafter, PEREZ and CHS-1 left the meeting location.

41.    A review of telephone toll records revealed that seconds after the transaction was completed, TARGET TELEPHONE 5 (used by PEREZ) placed two calls to TARGET TELEPHONE 3 (used by SOTO).

42.    CHS-1 met with investors at a secure location. Law enforcement followed the CHS-1 and he did not make any stops that were not requested by law enforcement. At the secure location, CHS-1 handed investigators the unused government funds, a white USPS box, and a larger brown box. CHS-1's person and vehicle were searched for contraband or excess funds with negative results. Investigators opened the boxes. From inside the white USPS box, law enforcement recovered three (3) black plastic Glock boxes. Within each of the Glock boxes was a firearm. The three firearms were (1) a polymer 80 style handgun with no serial number (commonly referred to as a "Ghost Gun"), (2) a Glock model 17 with serial number BNRZ988, and (3) a Glock model 22 with serial number DGP572. From within the larger brown box, law enforcement recovered a CZ model Scorpion with serial number G066709 (the firearm not inside a Glock box in the photograph below). Investigators observed that several the mailing labels were ripped off of the packages.

43.    The CZ Scorpion pictured below was originally purchased by PICHARDO on April 26, 2023, from Top Guns LLC in Deerfield, Kansas. This was seven days prior to the recovery of the CZ. The two Glock firearms were purchased by Jennifer Baker, who is the spouse of BAKER, from Postrock Trading Company West located at 1203 North Taylor Avenue, Garden City, Kansas, on April 28, 2023. No trace information has been identified for the fourth firearm, the "Ghost Gun" polymer 80 style handgun with no serial number.



44.     The firearms obtained by CHS-1 during the controlled purchase matched the

descriptions of the photographs sent to CHS-1 by PEREZ via TARGET TELEPHONE 5 prior to

the purchase as detailed above. A review of telephone toll records evidences that on April 28,

2023, TARGET TELEPHONE 3 (used by SOTO) called TARGET TELEPHONE 5 (used by

PEREZ) and spoke for approximately 20-minutes. Following the contact between TARGET

TELEPHONE 5 (used by PEREZ) and TARGET TELEPHONE 3 (used by SOTO), TARGET

TELEPHONE 5 contacted CHS-1 (confirmed by a review of toll records) and during that call,

CHS-1 and PEREZ spoke about the upcoming gun order. Following their conversation,

TARGET TELEPHONE 5 sent CHS-1 the photographs of firearms (confirmed by a review of

toll records). Given the timing of the exchange between TARGET TELEPHONE 3 (used by

SOTO) and TARGET TELEPHONE 5 (used by PEREZ) as being shortly before PEREZ sent

CHS-1 a photo of firearms available for purchase, I believe that SOTO (user of TARGET

TELEPHONE 3) contacted BAKER (user of TARGET TELEPHONE 2) or PICHARDO (user of

TARGET TELEPHONE 1) in order to coordinate the firearms purchase and shipment to DIAZ,

which were ultimately sold by PEREZ to CHS-1.

45.     Further, on the day of the controlled purchase TARGET TELEPHONE 3 (used by SOTO) had contact with TARGET TELEPHONE 2 (used by BAKER) seven (7) times. Five (5) of those communications were during or immediately after the controlled purchase. During the day of the controlled purchase, TARGET TELEPHONE 2 (used by BAKER) and TARGET TELEPHONE 1 (used by PICHARDO) had four (4) contacts.

46.     As detailed above, investigators received information from the USPIS that on May 1, 2023, two packages were mailed from Scott City, Kansas to the STASH LOCATION. One package weighed approximately 7 lbs. 14 oz. and the second package weighed approximately 9 lbs. 12 oz. Upon seizing the firearms and the USPS boxes via the controlled purchase, investigators weighed each box with the firearms included. One of the packages weighed approximately 7 lbs. 14 oz. and the other package weighed approximately 9 lbs. 11 oz.

47.     Records received from USPIS revealed that one parcel with tracking number 9505 5116 2542 3121 2638 52 was mailed on May 1, 2023. The parcel was mailed from the Scott City Main Post Office located at 211 S Main Street, Scott City, KS 67871-9998 at approximately 10:12 a.m. (CDT) and paid for in cash. The parcel weighed approximately 7 lbs. 14 ounces. The parcel was delivered to the STASH LOCATION the day of the controlled purchase at approximately 10:05 a.m. (EST).

48.     Records received from USPIS revealed that one parcel with tracking number 9505 5116 2542 3121 2638 76 was mailed on May 1, 2023. The parcel was mailed from the Scott City Main Post Office at approximately 10:13 a.m. (CDT) and paid for in cash. The parcel weighed approximately 9 lbs. 12 ounces. The parcel was delivered to the STASH LOCATION on the day of the controlled purchase at approximately 10:05 a.m. (EST).

49.     Information provided by USPIS relieved that two (2) IP addresses accessed the tracking information for both packages while in transit from Scott City, Kansas. Records obtained from Verizon revealed the IP addresses are subscribed to SOTO at 22734 Lakeway Drive, Diamond Bar, California.

**D.  Contact: PEREZ and CHS-1**

50.     Three days following the controlled purchase described above, CHS-1 advised investigators that he/she received a phone call from PEREZ, using TARGET TELEPHONE 5 that day. CHS-1 reported that during this phone call, PEREZ told CHS-1 that he just got off a conference call with his gun "connects" in California and Kansas. PEREZ told CHS-1 that he would send him/her photos of more guns that are available once either the Kansas or California people get back to him.

51.     Investigators reviewed the toll data from the existing pen registers on TARGET TELEPHONE 5 (used by PEREZ) and TARGET TELEPHONE 3 (used by SOTO) for this date (three days after the controlled purchase). Prior to CHS-1's phone call with PEREZ, pen register data revealed an outgoing phone call from TARGET TELEPHONE 5 (used by PEREZ) to TARGET TELEPHONE 3 (used by SOTO) immediately followed by a phone call from TARGET TELEPHONE 2 (used by BAKER) to TARGET TELEPHONE 3 (used by SOTO). Just after these phone calls, the Pen Register data indicated that a "Three Way Call" occurred. Given the timing of these communications, I believe that when PEREZ indicated that he had gun "connects" in California and Kansas he was referring to BAKER in Kansas and SOTO in California, and that he communicated with BAKER and SOTO in connection to his offer to provide photos of additional firearms for sale.

52.     The next day TARGET TELEPHONE 5 (used by PEREZ) contacted CHS-1 and

sent the firearm images below. TARGET TELEPHONE 5 (used by PEREZ) messaged CHS-1,

"I just need to know which big one you want so I can place the rest of the order".



53.     The next day at approximately 7:30 p.m., CHS-1 contacted investigators and

advised that he/she had just spoken with PEREZ, using TARGET TELEPHONE 5, about

ordering additional firearms. PEREZ advised CHS-1 that he would send him/her photographs of

firearms available for order. Subsequently, CHS-1 received the below photographs from PEREZ.



54.     Analysis of pen register data revealed that TARGET TELEPHONE 5 (used by

PEREZ) shows that TARGET TELEPHONE 5 and TARGET TELEPHONE 3 (used by SOTO)

spoke moments before PEREZ sent CHS-1 the photo depicted above at approximately 7:30 p.m.

More specifically, the pen register data shows that TARGET TELEPHONE 5 received an

incoming call from TARGET TELEPHONE 3 at 7:23 p.m. and the call lasted approximately 1

minute and 20 seconds. Additional pen register data thereafter reflects contact between Target

TELEPHONE 3 (used by SOTO), TARGET TELEPHONE 2 (used by BAKER) and then

TARGET TELEPHONE 5 (used by PEREZ).

55.     More specifically, TARGET TELEPHONE 3 (used by SOTO) placed and

outgoing call to TARGET TELEPHONE 2 (used by BAKER) and that call lasted approximately

2 minutes and 9 seconds. TARGET TELEPHONE 5 (used by PEREZ) placed an outgoing call to

CHS-1 at 7:27 p.m. with a duration of 20 seconds. Approximately one minute later, TARGET

TELEPHONE 5 (used by PEREZ) received an incoming call from TARGET TELEPHONE 3 (used by SOTO) with a duration of 1 minute and 6 seconds. TARGET TELEPHONE 5 (used by PEREZ) received an incoming call from CHS-1 at 7:30 p.m. with a duration of 58 seconds then another call from CHS-1 at 7:42 p.m. with a duration of 1 minute and 55 seconds. TARGET TELEPHONE 5 (used by PEREZ) received an incoming call from TARGET TELEPHONE 3 (used by SOTO) at 7:50 p.m. with a duration of 41 seconds. Given the timing of these communications, I believe PEREZ (using TARGET TELEPHONE 5) communicated with SOTO (using TARGET TELEPHONE 3) who communicated with BAKER (using TARGET TELEPHONE 2) to coordinate the firearm photos sent by PEREZ (using Target Telephone 5) to CHS-1.

**E. Additional Toll Analysis**

56.     A review of telephone toll records between February 6, 2023, through May 8, 2023, revealed 505 contacts between TARGET TELEPHONE 1 (used by PICHARDO) and TARGET TELEPHONE 2 (used by BAKER). A review of telephone toll records within the same date range revealed 317 contacts between TARGET TELEPHONE 2 (used by BAKER) and TARGET TELEPHONE 3 (used by SOTO). A review of toll records between March 23, 2023, through April 17, 2023, revealed 519 contacts between TARGET TELEPHONE 1 (used by PICHARDO) and a telephone number ending in 7733, a phone number associated with Timothy CLEER, the owner of Top Guns LLC located in Deerfield, Kansas. Given the shipments of the firearms described above, the photos of firearms available to purchase, and the phone contact between the parties, I believe that BAKER (TARGET TELEPHONE 2) purchases firearms from PICHARDO (TARGET TELEPHONE 1) and that they utilize their respective

cellular telephones in connection to such activities. I further believe that PICHARDO purchases firearms from Top Guns LLC which he then resells such firearms on behalf of the GTO.

57.     Between August 12, 2020, through May 3, 2023, PICHARDO purchased at least 73 firearms. Data base information reveals that all of the firearms were purchased from "Top Guns LLC" or "Tops Guns." To date, of the 73 firearms purchased by PICHARDO, six firearms have been recovered by law enforcement in San Bernadino, California; Detroit, Michigan; Waterbury, Connecticut; and Naugatuck, Connecticut. A firearm purchased by PICHARDO on July 3, 2022, was recovered by law enforcement in San Bernardino, California at the scene of the homicide of a juvenile on August 27, 2022.

**F. Information from Cooperating Defendant**

58.     In January 2023, HIS in Detroit, MI, conducted an interview of a cooperating defendant (hereafter referred to as "CD-1") who was arrested after attempting to smuggle three firearms into Canada from the United States. Two of the three firearms were purchased by PICHARDO three days prior at Top Guns LLC.

59.     CD-1 stated he traveled from Canada to Kansas and met with a man he knew as "Ramon." CD-1 said he communicated with Ramon over WhatsApp. Ramon sold him five handguns. CD-1 said he paid Ramon $1,800 for two of the firearms. CD-1 gave two of the handguns to a person near the Mexican American border named "Dave." CD-1 asserted that Dave had previously paid Ramon for the firearms. CD-1 said he was supposed to give Dave three handguns but forgot to give him one. CD-1 then drove back to the Canadian border where he was arrested for attempting to cross into the country with the remaining three firearms of the

five firearms CD-1 purchased from Ramon.[6] CD-1 described Ramon as a Hispanic male who drove an older red pickup truck. A review of a database revealed PICHARDO owned a 2001 red F-150 truck.

60.     As a result of CD-1's arrest, his phone was seized. A search warrant was obtained by HSI, and as a result multiple WhatsApp conversations were located. These conversations were in Spanish and were translated by HSI analysts. A summary of the conversations are as follows:

61.     In October 2022, in a conversion with an individual believed to be Cesar Jauregui, who is a Mexican National, CD-1 told a Jauregui that he had a friend who buys guns legally from a store, so CD-1 should be able to get 6 firearms for Jauregui.

62.     In December 2022, CD-1 sent photos of a .38 revolver and a Girsan MCP35 bearing Serial Number T6368-22EU05648 to an individual believed to be Juan Lerma, who is also a Mexican National.  Records reveal the Girsan was purchased by PICHARDO on December 5, 2022. CD-1 sent a photo of a Glock 21, Serial Number LAS853 and a DTI-15, 5.56 caliber, Serial Number S259142 to Lerma and asked how much he would pay for these firearms. Within this same conversation CD-1 told Lerma that he has a friend buying guns from a store now and inquired how much they are selling for now. CD-1 claimed his last shipment was in August of last year where he sold similar firearms.

---

[6] CD-1 has no identified criminal history. CD-1 has provided information to law enforcement in the hope of consideration towards his pending federal charges. Based on the corroboration of information provided by CD-1, I believe that he has provided accurate and truthful information regarding his illegal purchase of firearms from PICHARDO.

63.    The following is a transcription[7] of January 2023 audio messages exchanged between CD-1 and PICHARDO obtained from the phone seized by HSI described above. A review of CD-1's WhatsApp contacts revealed TARGET TELEPHONE 1 to be listed as a contact with the label, "RAMON ELKHART".

**CD-1:**        What's up?

**RAMON:**    Here, chilling and you? Are you already in Canada?

**CD-1:**        No, buddy. We're getting there tomorrow. Yeah, we're going over there tomorrow. We rented a hotel for the night, and we should be arriving to Canada the following. Yeah…

**RAMON:**    Alright, alright… So, you're on your way there. You are not here, in Elkhart?

**CD-1:**        Good morning, buddy. I took off this morning from there, from Elkhart. I still have 18 something hours to get there *[Canada]*. I still have a long way to go, but we're chugging along.

**RAMON:**    That's what's up, buddy. Good luck and it was a pleasure to have worked… Well, we are ready for anything you need. Just give me a call when you are ready. We'll keep in touch to see when I can come visit you there, in Canada, Ontario.

**CD-1:**        No, buddy. The pleasure was all mine. That's right, we'll continue making deals. Just wait for everything to sell over there. Give me about two (2) weeks and I will have something new for you- - to request you. Yeah, two (2) weeks to a month so you spend a little bit of time without buying anything and then you start again. Alright, we'll leave things as they are for now until they send me the rest of the money. Alright, thank you very much, eh. I will let you know when I arrive over there *[Canada]*.

**RAMON:**    Alright, alright, buddy! Same, it was a pleasure. Either way, we already created a friendship and have each other's contact information to keep greeting each other and communicating.  I will slowly continue getting those long ones you told me about.  Are you listening to rap music?

**CD-1:**        [LAUGHS] No, some songs are rap, but I like the corridos or Spanish songs better. Yah, try to grab the hunting ones, 223s, AK47, and R15s… Just make sure

---

[7] The recitation of calls is based on a preliminary review of the line-sheet and/or call, and is in draft from and subject to revision upon further review.

they are not very… they are not a ridiculous caliber. I mean, R15 like the caliber of 300, 300 barrels, I think it is. They do not want those. Only 223 caliber, and AK47 or [UI].  But yeah, send me photos when you get something for a good price, and I will tell you 'Yes or no'. Yeah.

**RAMON:**     Alright, alright.

### G.  Historical Information

#### i.  SUBJECT PARCEL 1

64.     As detailed above, investigators received information from the USPIS that on May 1, 2023, two packages were mailed from Scott City, Kansas to the STASH LOCATION. Investigators ultimately, through CHS-1, conducted the controlled purchase of the four firearms which were contained within boxes matching the description and weight of the packages received by DIAZ at the STASH LOCATION during the week ending on May 6, 2023. Information from USPIS reflects similar prior packages.

65.     A review of USPS records revealed that a package (hereafter, "SUBJECT PARCEL 1") had a tracking number of 9505 5265 4166 3088 5474 32. The parcel bore the following return address: "Orlando Diaz," at the address for SOTO's residence/business (minus the apartment number) in Diamond Bar, CA 91765, and the recipient address as: "Angely Diaz" at the STASH LOCATION. SUBJECT PARCEL 1 was mailed from a contract post office named, CPU Cyclone Private Boxes, located at 23545 Palomino Drive, Ste A, Diamond Bar, CA 91765-1625. SUBJECT PARCEL 1 was mailed on March 29, 2023, at approximately 14:55, was paid for with cash and weighed approximately 4 lbs. SUBJECT PARCEL 1 was delivered to the STASH LOCATION on March 31, 2023, at approximately 09:47 a.m. Per Postal records, the following IPs tracked SUBJECT PARCEL 1:

| IP | Date | Time |
|---|---|---|
| 104.173.229.239 | 03/29/2023 | 17:20:21 |
| 174.195.196.78 | 03/30/2023 | 06:28:45 |
| 174.204.64.88 | 04/01/2023 | 15:31:36 |
|  | 04/01/2023 | 15:31:55 |
| 2600:100f:b029:c65d:340b:464e:a8b:60d8 | 03/31/2023 | 19:54:05 |
|  | 03/31/2023 | 19:55:11 |
|  | 03/31/2023 | 19:56:19 |
|  | 04/01/2023 | 10:06:28 |
|  | 04/02/2023 | 20:45:13 |
|  | 04/02/2023 | 20:45:28 |
|  | 04/02/2023 | 20:45:49 |
|  | 04/02/2023 | 20:46:24 |
|  | 04/02/2023 | 20:47:06 |
|  | 04/02/2023 | 20:47:29 |
|  | 04/03/2023 | 08:52:31 |
|  | 04/03/2023 | 08:52:33 |
|  | 04/03/2023 | 08:52:38 |
| 2600:1010:b121:2658:5563:c775:d470:66c c | 03/31/2023 | 10:09:39 |
|  | 03/31/2023 | 10:12:05 |
| 2600:1012:b141:c43f:15d2:914b:6832:d9a 6 | 03/30/2023 | 14:40:30 |
|  | 03/30/2023 | 14:40:38 |

66.    Information received from Verizon pertaining the IPV6 data associated with 2600:100f:b029:c65d:340b:464e:a8b:60d8 between March 31, 2023, at 10:32 p.m. through April 1, 2023, at 4:32 a.m., revealed an association with MSISDN of 9095385064. Verizon records associated with MSISDN 9095385064 revealed it to be associated with Account Number 442452494-1, an account subscribed to FERNANDO SOTO, and business "MF EXPRESS LLC". The address associated with the account was identified as the address for SOTO's residence/business (minus the apartment number) in Diamond Bar, CA 91765 and lists the number assigned to TARGET TELEPHONE 3 as his work phone. Given this information, I believe SOTO was checking the tracking information for SUBJECT PARCEL 1 as it made its way from SOTO's location in Diamond Bar, California, to DIAZ at the STASH LOCATION in Hartford, Connecticut.

67.    On April 12, 2023, a USPIS Task Force Officer (TFO) responded to Cyclone

Private Boxes to review video footage pertaining to SUBJECT PARCEL 1 shipped on March 29,

2023. A review of the video footage revealed a male subject (photograph below) described as a

Hispanic, with a beard, wearing a black baseball hat and a blue 'NY Yankees' jersey and

matching the description of SOTO.



68.    The TFO conducted a check of License Plate Reading Camera images in the area

of Cyclone Private Boxes and located a blue Ford Mustang hit on a camera in the area on March

29, 2023, at 5:34:50 p.m. This Mustang had a license plate of Connecticut registration 8WPB820

and was registered to Fernando SOTO Jr., at the address for SOTO's residence/business

(including the apartment number) in Diamond Bar, CA 91765 22734.

69.    Toll records reveal that TARGET TELEPHONE 3 (used by SOTO) and

TARGET TELEPHONE 4 (used by DIAZ) had six contacts on March 28, 2023, the day before

SUBJECT PARCEL 1 was mailed. TARGET TELEPHONE 1 (used by PICHARDO) and

TARGET TELEPHONE 2 (used by BAKER) had eight contacts on the day SUBJECT PARCEL

1 was mailed (March 29, 2023). TARGET TELEPHONE 2 (used by BAKER) and TARGET

TELEPHONE 3 (used by SOTO) had nine contacts on the day SUBJECT PARCEL 1 was

mailed. TARGET TELEPHONE 1 (used by PICHARDO) and TARGET TELEPHONE 2 (used by BAKER) had eight contacts on March 30, 2023 (the day after SUBJECT PARCEL 1 was mailed and one day prior to its delivery). TARGET TELEPHONE 2 (used by BAKER) and TARGET TELEPHONE 3 (used by SOTO) had five contacts on March 31, 2023 (the day SUBJECT PARCEL 1 was delivered to the STASH LOCATION). TARGET TELEPHONE 3 (used by SOTO) and TARGET TELEPHONE 5 (used by PEREZ) had one contact on March 31, 2023.

### ii.  SUBJECT PARCEL 2

70.     A review of USPS records revealed that a package (hereafter, "SUBJECT PARCEL 2") had a tracking number of 9505 5116 2542 3086 2600 95 was mailed from the Scott City Main Post Office, 211 S Main Street, Scott City, KS 67871-9998 on March 27, 2023. SUBJECT PARCEL 2 was paid for with cash and weighed approximately 8 lbs. 14 ounces. SUBJECT PARCEL 2 was delivered to the STASH LOCATION on March 29, 2023.

71.     Toll records reveal that TARGET TELEPHONE 2 (used by BAKER) and TARGET TELEPHONE 3 (used by SOTO) had four contacts on the day SUBJECT PARCEL 2 was mailed (March 27, 2023). TARGET TELEPHONE 3 (used by SOTO) and TARGET TELEPHONE 5 (used by PEREZ) had three contacts the day SUBJECT PARCEL 2 was delivered to the STASH LOCATION (March 29, 2023).

### iii.  SUBJECT PARCEL 3 and SUBJECT PARCEL 4

72.     A review of USPS records revealed that a package (hereafter, "SUBJECT PARCEL 3") had a tracking number of 9505 5265 4167 3075 1492 11 was mailed from CPU Cyclone Private Boxes, located at 23545 Palomino Drive, Ste A, Diamond Bar, CA 91765-1625 on March 16, 2023. SUBJECT PARCEL 3 was paid for with cash and weighed approximately 4

lbs. 7 ounces. SUBJECT PARCEL 3 was delivered to the STASH LOCATION on March 18, 2023.

73.     A review of USPS records revealed that a package (hereafter, "SUBJECT PARCEL 4") had a tracking number of 9505 5265 4167 3075 1492 35 was mailed from CPU Cyclone Private Boxes, located at 23545 Palomino Drive, Ste A, Diamond Bar, CA 91765-1625 on March 16, 2023. SUBJECT PARCEL 4 was paid for with cash and weighed approximately 4 lbs. 7 ounces. SUBJECT PARCEL 4 was delivered to the STASH LOCATION on March 18, 2023.

74.     Toll records reveal that TARGET TELEPHONE 2 (used by BAKER) and TARGET TELEPHONE 3 (used by SOTO) had five contacts on the day SUBJECT PARCEL 3 and SUBJECT PARCEL 4 were mailed (March 16, 2023). TARGET TELEPHONE 3 (used by SOTO) and TARGET TELEPHONE 4 (used by DIAZ) had on contact the day SUBJECT PARCEL 3 and SUBJECT PARCEL 4 were mailed. TARGET TELEPHONE 1 (used by PICHARDO) and TARGET TELEPHONE 2 (used by BAKER) had eight contacts on the day SUBJECT PARCEL 3 and SUBJECT PARCEL 4 were delivered to the STASH LOCATION (March 18, 2023). TARGET TELEPHONE 2 (used by BAKER) and TARGET TELEPHONE 3 (used by SOTO) had eleven contacts between March 17, 2023, and March 18, 2023. TARGET TELEPHONE 3 (used by SOTO) and TARGET TELEPHONE 4 (used by DIAZ) had twenty contacts between March 17, 2023, and March 18, 2023. TARGET TELEPHONE 4 (used by DIAZ) and TARGET TELEPHONE 3 (used by SOTO) had fourteen contacts on March 18, 2023. TARGET TELEPHONE 4 (used by DIAZ) and TARGET TELEPHONE 5 (used by PEREZ) had seven contacts on March 18, 2023.

### iv.  SUBJECT PARCEL 5

75.     A review of USPS records revealed that a package (hereafter, "SUBJECT PARCEL 5") had a tracking number of 9505 5265 4167 3048 1464 14 was mailed from CPU Cyclone Private Boxes, located at 23545 Palomino Drive, Ste A, Diamond Bar, CA 91765-1625 on February 17, 2023. SUBJECT PARCEL 5 was paid for with cash and weighed approximately 5 lbs. 2 ounces. SUBJECT PARCEL 5 was delivered to the STASH LOCATION on February 21, 2023.

76.     A review of tolls records reflects that TARGET TELEPHONE 2 (used by BAKER) and TARGET TELEPHONE 1 (used by PICHARDO) had forty contacts between February 16, 2023, and February 17, 2023 (the day SUBJECT PARCEL 5 was mailed from California). TARGET TELEPHONE 3 (used by SOTO) and TARGET TELEPHONE 2 (used by BAKER) had one contact on February 17, 2023. TARGET TELEPHONE 1 (used by PICHARDO) and TARGET TELEPHONE 2 (used by BAKER) had twenty-two contacts on February 20, 2023 (the day before SUBJECT PARCEL 5 was delivered to the STASH LOCATION). TARGET TELEPHONE 3 (used by SOTO) and TARGET TELEPHONE 2 (used by BAKER) had six contacts between February 20, 2023, and February 21, 2023. TARGET TELEPHONE 3 (used by SOTO) and TARGET TELEPHONE 4 (used by DIAZ) had six contacts on February 21, 2023. TARGET TELEPHONE 3 (used by SOTO) and TARGET TELEPHONE 5 (used by PEREZ) had one contact on February 21, 2023.

**v.  Additional SUBJECT PARCELS and Shipper Information**

77.     A review of USPS records revealed that a package (hereafter, "SUBJECT PARCEL 6") had a tracking number of 9505 5265 4166 3006 5300 10 was mailed from CPU Cyclone Private Boxes, located at 23545 Palomino Drive, Ste A, Diamond Bar, CA 91765-1625 on January 6, 2023. SUBJECT PARCEL 6 was paid for with cash and weighed approximately 4

lbs. 4 ounces. SUBJECT PARCEL 6 was delivered to the STASH LOCATION on January 9, 2023.

78.     A review of USPS records revealed that a package (hereafter, "SUBJECT PARCEL 7") had a tracking number of 9505 5133 7372 3031 5436 74 mailed on January 31, 2023, from the Diamond Bar Post Office, 1317 S Diamond Bar Blvd., Diamond Bar, CA 91765 to and was addressed to "Brian Baker," at a particular address on Church St, Scott City KS 67871. SUBJECT PARCEL 7 weighted approximately 14 ounces and was delivered on February 7, 2023.

79.     A review of the return addresses associated with the labels for the SUBJECT PARCELS described above revealed the following shipper information associated with each parcel:

- SUBJECT PARCEL 1, "Orlando Diaz"

- SUBJECT PARCEL 2, [No return address identified]

- SUBJECT PARCEL 3, "Fernando Diaz"

- SUBJECT PARCEL 4, "Fernando Diaz"

- SUBJECT PARCEL 5, "Jose Diaz"

- SUBJECT PARCEL 6, "Angel [Last Name unintelligible]"

- SUBJECT PARCEL 7, "Fernando Soto"

80.     I believe that the package shipped from Kansas to the STASH LOCATION was shipped by BAKER and the packages shipped from California to the STASH LOCATION were shipped by SOTO. Investigators note that BAKER's residence in Scott City, Kansas is .7 miles from the post office in which SUBJECT PARCEL 2 was shipped from. Investigators note that SOTO's residence in Diamond Bar, California is 1.5 miles from the contract post office in which

34

SUBJECT PARCEL 1, SUBJECT PARCEL 3, SUBJECT PARCEL 4, SUBJECT PARCEL 5, and SUBJECT PARCEL 6 were shipped from.

81.     I believe that the smaller packages shipped to and from SOTO to BAKER, such are SUBJECT PARCEL 7, are consistent with United States Currency being mailed as payment for illegal transactions of the GTO.

82.     I believe that SOTO and BAKER use the STASH LOCATION to ship firearms to lower the risk of law enforcement's ability to obtain the true attribution of the package shippers and recipients. Investigators note that the STASH LOCATION is .2 miles from DIAZ's RESIDENCE in Hartford, Connecticut. Because the recipient of the package, DIAZ, does not actually live at the address in which the firearms are delivered to by the GTO, members of the GTO are forced to check the tracking information associated with each package and use the SUBJECT TELEPHONES to communicate with each other to coordinate the shipments of the firearms. As detailed above, in conjunction with the suspected delivery firearms to the STASH LOCATION, DIAZ, using TARGET TELEPHONE 4, communicated with SOTO, using TARGET TELEPHONE 3, and PEREZ, using TARGET TELEPHONE 5.

## H. Summary

83.     Given all of the foregoing, there is probable cause to believe that the requested location information associated with TARGET TELEPHONE 4 (used by DIAZ) and TARGET TELEPHONE 5 (used by PEREZ) will show patterns of communication associated with obtaining, storing, and mailing firearms on behalf of the GTO.

## Cell-Site Data

84.     In my training and experience, I have learned that the Service Providers is a company that provides cellular communications service to the public. I also know that providers

of cellular communications service have technical capabilities that allow them to collect and

generate information about the locations of the cellular devices to which they provide service,

including cell-site data, also known as "tower/face information" or "cell tower/sector records."

Cell-site data identifies the "cell towers" (*i.e.*, antenna towers covering specific geographic

areas) that received a radio signal from the cellular device and, in some cases, the "sector" (*i.e.*,

faces of the towers) to which the device connected. These towers are often a half-mile or more

apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the

tower closest to a wireless device does not necessarily serve every call made to or from that

device.  Accordingly, cell-site data provides an approximate general location of the cellular

device.

85.     Based on my training and experience, I know that the Service Providers can

collect cell-site data on a prospective basis about the TARGET TELEPHONES. Based on my

training and experience, I know that for each communication a cellular device makes, its wireless

Service Providers can typically determine: (1) the date and time of the communication; (2) the

telephone numbers involved, if any; (3) the cell tower to which the customer connected at the

beginning of the communication; (4) the cell tower to which the customer was connected at the

end of the communication; and (5) the duration of the communication. I also know that wireless

providers such as the Service Providers typically collect and retain cell-site data pertaining to

cellular devices to which they provide service in their normal course of business in order to use

this information for various business-related purposes.

### E-911 Phase II / GPS Location Data

86.     I know that some providers of cellular telephone service have technical

capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data

or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

87.     Based on my training and experience, I know that the Service Providers can collect E-911 Phase II data about the location of the TARGET TELEPHONES, including by initiating a signal to determine the location of the TARGET TELEPHONES on the Service Providers's network or with such other reference points as may be reasonably available.

**Pen-Trap Data**

88.     Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number (ESN), a Mobile Electronic Identity Number (MEIN), a Mobile Identification Number (MIN), a Subscriber Identity Module (SIM), a Mobile Subscriber Integrated Services Digital Network Number (MSISDN), an International Mobile Subscriber Identifier (IMSI), or an International Mobile Equipment Identity (IMEI). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-

trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

## Subscriber Information

89.     Based on my training and experience, I know that wireless providers such as the Provider typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service.  I also know that wireless providers such as the Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business.  In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the TARGET TELEPHONES user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

90.     Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

91.     I further request that the Court direct the Service Providers to disclose to the government any information described in Section I of Attachment B-1 and Section I of Attachment B-2 that is within its possession, custody, or control.

92.     I also request that the Court direct the Service Providers to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B-1 and Attachment B-2 unobtrusively

and with a minimum of interference with the Service Providers' services, including by initiating

a signal to determine the location of the TARGET TELEPHONES on the Service Providers'

network or with such other reference points as may be reasonably available, and at such intervals

and times directed by the government. The FBI shall reasonably compensate the Service

Providers for reasonable expenses incurred in furnishing such facilities or assistance.

93.    I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal

Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until

30 days after the collection authorized by the warrant has been completed.  There is reasonable

cause to believe that providing immediate notification of the warrant may have an adverse result,

as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the

TARGET TELEPHONES would seriously jeopardize the ongoing investigation, as such a

disclosure would give that person an opportunity to destroy evidence, change patterns of

behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As

further specified in Attachment B-1 and Attachment B-2, which is incorporated into the warrant,

the proposed search warrant does not authorize the seizure of any tangible property. *See* 18

U.S.C. § 3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire

or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic

information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18

U.S.C. § 3103a(b)(2).  I further request the last 60 days of historical cell site data.

94.    Because the warrant will be served on the Service Providers, who will then

compile the requested records at a time convenient to it, reasonable cause exists to permit the

execution of the requested warrant at any time in the day or night.  I further request that the

Court authorize execution of the warrant at any time of day or night, owing to the potential need

to locate the TARGET TELEPHONES outside of daytime hours.

Respectfully submitted,

CORBETT TOMSOVIC

Digitally signed by
CORBETT TOMSOVIC
Date: 2023.05.11
15:46:31 -04'00'

_____

CORBETT TOMSOVIC
SPECIAL AGENT, FBI

Subscribed and sworn to me by telephone or other reliable means on May ___11___, 2023

Robert M. Spector

Digitally signed by Robert
M. Spector
Date: 2023.05.11
16:47:31 -04'00'

_____

HON. ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

1. The cellular telephone assigned call numbers (collectively referred to as the "TARGET TELEPHONES"):

- **860-996-4514, referred to as "TARGET TELEPHONE 4"** (serviced by Verizon, a wireless service provider headquartered in Bedminster, New Jersey); and
- **860-672-8243, referred to as "TARGET TELEPHONE 5"** (serviced by AT&T, a wireless service provider headquartered in North Palm Beach, Florida)

2. Information about the location of TARGET TELEPHONES that is within the possession, custody, or control of AT&T and Verizon (the Service Providers), including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to be Seized

**I.  Information to be Disclosed by the Service Providers:**

To the extent that the information described in Attachment A is within the possession, custody,

or control of the Service Providers, including any information that has been deleted but is still

available to the Service Providers or that has been preserved pursuant to a request made under 18

U.S.C. § 2703(f), the Service Providers is required to disclose to the government the following

information pertaining to the Account listed in Attachment :

    a.  ***Historical and Subscriber Information -*** To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period **April 15, 2023 to DATE OF WARRANT AUTHORIZATION**:

        i.  Names (including subscriber names, user names, and screen names);

        ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii.  Local and long distance telephone connection records;

        iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.  Length of service (including start date) and types of service utilized;

        vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

2

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **TARGET TELEPHONES**, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records, email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as Real Time Tool data (also known as "RTT").

b. *Historical Call/Text/Data Detail Records with Location Information* - All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

i. The date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses) through the communications sent and received for the time period of **April 15, 2023, to DATE OF WARRANT AUTHORIZATION**; and

ii. All historical location information, including data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received. Information regarding the cell tower and antenna face (also known as sectors) through the communications sent and received for the time period of **April 15, 2023, to DATE OF WARRANT AUTHORIZATION.**

c. *Specialized Location Records -* All call, text, and data connection session location information, related to all specialized carrier records that may be referred to as NELOS (Network Event Location System), LOCDBOR (Location Database of Record), RTT (Real Time Tool), PCMD (Per Call Measurement Data), TDOA or Timing Advance Information (also known as TrueCall), Mediation Records, E9-1-1, and/or Historical GPS/Mobile Locate Information which shows GPS location (longitude and latitude) and Cell-Site and Sector of the device in relationship to the network when connected to the network with the identified

3

mobile number account, from **April 15, 2023, to DATE OF WARRANT AUTHORIZATION.**

d.  ***Prospective Location Information -*** The Service Providers shall provide all prospective location information about the location of the **TARGET TELEPHONES** described in Attachment A for a period of **thirty days**, during all times of day and night. "Information about the location of the **TARGET TELEPHONES**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A**.** To the extent that the location information is within the possession, custody, or control of the Service Providers, the Service Providers are required to disclose the Location Information to the government. In addition, Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Providers' services, including by initiating a signal to determine the location of the **TARGET TELEPHONES** on Service Providers' network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The Service Providers are required to provide the following records associated with **TARGET TELEPHONES**; NELOS (Network Event Location System), LOCDBOR (Location Database of Record), RTT (Real Time Tool), PCMD (Per Call Measurement Data), TDOA or Timing Advance Information (also known as TrueCall);

   i.  To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Providers, the Service Providers are required to disclose the Location Information to the government.  In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Service Providers' services, including by initiating a signal to determine the location of the **TARGET TELEPHONES** on the Service Providers' network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall compensate the Service Providers for reasonable expenses incurred in furnishing such facilities or assistance.

   ii. This warrant does not authorize the seizure of any tangible property.  In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information.  *See* 18 U.S.C. § 3103a(b)(2).

e. ***Prospective Pen-Trap Information -*** Pursuant to 18 U.S.C. § 3123, the FBI may install and use pen-trap devices to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the **TARGET TELEPHONES** identified in Attachment A-2, including the date, time, and duration of the communication, and the following, without geographic limit:

1. IP addresses associated with the cell phone device or devices used to send or receive electronic communications
2. Any unique identifiers associated with the cell phone device or devices used to make and receive calls with the **TARGET TELEPHONES**, or to send or receive other electronic communications, including the ESN, MEIN, IMSI, IMEI, SIM, MSISDN, or MIN
3. IP addresses of any websites or other servers to which the cell phone device or devices connected
4. Source and destination telephone numbers and email addresses
5. "Post-cut-through dialed digits," which are digits dialed after the initial call set up is completed, subject to the limitations of 18 U.S.C. § 3121(c).

Pursuant to 18 U.S.C. § 3123(c)(1), the use and installation of the foregoing is authorized for **thirty days** from the date of this Order. Service Providers must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Service Providers' services, including by initiating a signal to determine the location of the **TARGET TELEPHONES** on Service Providers' network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

**II. Information to be Seized by the Government:**

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of Title 18 U.S.C. § 922(a)(6) (False Statement in Purchase of a Firearm); Title 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm); Title 18 U.S.C. § 922(d)(1) (Sale of Firearm to a Convicted Felon); Title 18 U.S.C. § 932 (Straw Purchasing of Firearms); Title 18 U.S.C. § 933 (Trafficking in Firearms); and Title 18 U.S.C. § 1715 (Firearms as Nonmailable; Regulations) (hereafter referred to as the "Target Offenses") have been committed, are being committed, and will be committed by Ramon PICHARDO, Brian BAKER, Fernando SOTO Jr., Algelly DIAZ, Luis PEREZ and others.

6